IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **TERRY HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO: 2:05CV1083-WKW-TFM** |
| | ) | |
| **JOSEPH BORG,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## DEFENDANT JOSEPH BORG'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant Joseph Borg and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves this Court for summary judgment on all Plaintiff's claims. In support of this motion, Defendant files the attached Affidavit of Joseph P. Borg [Ex. One Borg Aff.] and the Affidavit of Senior Special Agent John M. Foley [Ex. Two Foley Aff.], each with Attachments. As grounds for this motion your Defendant states as follows:

**I. Note Regarding the Pleadings.**

This motion is before the Court on the Plaintiff's original Complaint based on the Court's Order of March 13, 2007 [Doc. 44] denying Plaintiff's Motion to Amend. As to that Complaint, the Court has ordered the class action allegations stricken and has recently granted the voluntary dismissal of the co-Plaintiff, Dorothy Watford, and her allegations with prejudice, Order of May 21, 2007 [Doc. 48]. However, the Defendant has received a draft pretrial order from the Plaintiff which attempts to further amend the Complaint by adding new allegations. The Defendant anticipates that the Plaintiff will refuse to be bound by the allegations before the Court and will attempt to respond to this motion with these additional

1

allegations. Therefore, the Defendant has bifurcated this motion to demonstrate his entitlement to summary judgment based on the Complaint actually before the Court and, secondly, based on the anticipated un-pled allegations he expects the Plaintiff will attempt to make.

## INTRODUCTION

1.      The Plaintiff was investigated for violation of Alabama securities laws by the Alabama Securities Commission ("ASC") of which the Defendant is Director.  While he was under investigation, and with the advice of his attorney, Plaintiff Harris caused certain securities, which were being held in California, to be liquidated, returning the proceeds of that liquidation as a partial recompense to the investors.  Thereafter, the ASC issued a cease and desist order which required only that the ordered parties, who were not licensed as securities brokers in Alabama:

> "… Cease and desist from further offers or sales of any security into, within
>
> or from the State of Alabama."

This order was dated June 10, 2003 and it was issued by ASC, not Joseph Borg, the Defendant [Ex. One Borg Aff. Attachment 1].  The limited scope of this order is a fact that Plaintiff is not inclined to recognize.

2.      Plaintiff's original Complaint which, by this Court's order of March 13, 2007 denying Plaintiff's Motion to Amend, [Doc. 44] is the pleading on which this matter is to be considered, names three plaintiffs: Terry Harris, Dorothy Watford, and a purported class variously described as Networker 2000.com, Inc, Wealth Builders International and Infinity 2000.  [Ex. One Borg Aff. Attachment 2 ]  The Court denied the certification of any class in its order of October 31, 2006 and ordered the class allegations stricken [Doc. 44]. The parties submitted a Stipulation of Dismissal (with prejudice) for the other Plaintiff, Ms. Watford, and

Ms. Watford has been dismissed [Doc. 48]. This leaves only Mr. Harris as a plaintiff and only his claims to be defended by Mr. Borg, the sole defendant.

3.     Mr. Borg is the only Defendant. He is described as "Commissioner" of the Alabama Securities Commission ["ASC"] in Plaintiff's Complaint [Ex. One Borg Aff. Attachment 2 ¶ 11]. In fact, Mr. Borg is the Director of the ASC and is not one of its commissioners [Ex. One Borg Aff. ¶ 2]. He serves to carry out the decisions of the ASC commissioners. The Complaint avers that the Defendant acted in his official and individual capacity [Ex. One Borg Aff. Attachment 2 ¶¶ 13 and 14], but it is unclear which acts Mr. Harris attributes to which capacity[ies]. For purposes of this motion, Defendant assumes that Plaintiff contends that Mr. Borg took all of the actions complained about in both capacities

4.     Mr. Harris' Complaint has one "Causes [sic] of Action" that complains of the defendant: a). issuing a cease and desist order, b). causing Harris to "send a letter to Charles Schwab… to liquidate the stock and option positions he controlled, and c). causing Harris to liquidate those stock and option positions [Id.]. Mr. Harris claims that these actions violated various statutes and the U.S. Constitution as a "taking" without "procedural due process." These are the only acts attributed to Mr. Borg in the Complaint. The Complaint states in its initial paragraph that "[t]his is a suit for race discrimination….", but beyond that conclusory statement and a statement identifying the race of the Plaintiff, no mention of acts of discrimination is to be found in the Complaint.

5.     All of Plaintiff's claims are based, at least partially, upon the contention that the cease and desist order forced Mr. Harris to liquidate accounts. The plain terms of the order, set out above, show that it did no such thing. It was directed solely to cessation of the offering or selling any security by the unregistered parties and entities. Additionally, the order is dated June

10, 2003 [Ex. One Borg Aff. Attachment 1]. Mr. Harris contends in his Complaint that he was forced to liquidate the accounts in April of 2003 [Ex. One Borg Aff. ¶¶ 13 and 14]. That was almost two months before the issuance of the order that he avers forced him to take the action. Mr. Harris' allegations fly in the face of the simple logic that an act, in this case, the Order, cannot be the cause of an antecedent act, the liquidation.  Further, on January 17, 2003, Charles Schwab had written Mr. Harris telling him that it was requiring him to close the accounts referred to in the Complaint.  This was three months before he liquidated the accounts and five months before the supposedly-causative order.  [Ex. One Borg Aff. Attachment 5 ¶ 3].  Actually, the liquidation was personally authorized by Mr. Harris on April 15, 2003 [Ex. One Borg Aff. Attachment 4] and conveyed to Charles Schwab in a letter from Mr. Harris' attorney, Andrew Chambless, on April 18, 2003  [Ex. One Borg Aff. Attachment 3].

6.     The issuer of the cease and desist order was ASC [Ex. One Borg Aff. ¶ 7]. Mr. Borg signed it as Director, but it is the Commission that has the power to issue such orders and Mr. Borg can only sign them in his official capacity [Ex. One Borg Aff. ¶¶ 8 and 9]. Indeed, this Court can take judicial notice that "Citizen Borg" cannot issue an enforceable order, and he did not attempt to do so [See signature line on Ex. One Borg Aff. Attachment 1]. Mr. Harris came to the attention of the ASC based on a complaint by someone other than Mr. Borg who had no personal knowledge of Mr. Harris [Ex. One Borg Aff. ¶ 3]. Mr. Harris' activities were investigated by members of the ASC investigatory staff, [Ex. Two Foley Aff. lines 2 and ¶ k]. The two primary investigators happened to be African American [Ex. Two Foley Aff. ¶ k] Mr. Borg's actions as regards the investigation were taken in reliance on the facts reported to him by his staff, the recommendations of his legal counsel, and admissions and acknowledgements made by Harris' numerous legal counsel [Ex. One Borg Aff. ¶ 10]. Mr. Borg took no independent

actions regarding Mr. Harris for which he could conceivably have individual liability [See Ex. One Borg Aff. ¶¶ 9 and 10]. Defendant believes that all of these facts will be undisputable before the Court. The Court can expect plaintiff to claim that Mr. Borg had it in for him, but those "claims" will be unalloyed and unsupported opinions without any basis in fact. The actual facts provide a basis for summary judgment for Mr. Borg against Mr. Harris.

7.      The Foley Affidavit filed herewith [Ex. Two Foley Aff.] also demonstrates that the liquidation, about which Mr. Harris complains, was voluntarily undertaken by Mr. Harris on the advice of his attorneys and not ordered by Mr. Borg or ASC. Mr. Foley attaches correspondence that shows:

a.      Mr. Harris faxed him about his intention to "voluntarily do a quiet recession" of the Wealth Builders funds, [Ex. Two Foley Aff. ¶ e];

b.      Mr. Harris's attorney wrote him about Mr. Harris' "outline for liquidating the securities positions" at Schwab [Ex. Two Foley Aff. ¶ f];

c.      That Mr. Foley confirmed this correspondence with Mr. Harris' attorney leaving the timing of the liquidation up to Mr. Harris [Ex. Two Foley Aff. ¶ g]; and

d.      That the liquidation and accumulation of funds was handled under the supervision and coordination of Mr. Harris' attorney [Ex. Two Foley Aff. ¶ h].

**II. Grounds for Summary Judgment.**

**A. Based on the Complaint**

**1. Fact-Based Grounds.**

**a.      Admission the Plaintiff is not the Real Party in Interest.** Mr. Harris has pled that he does not own the claims he pursues in his Complaint. In his Brief in Support of Motion to Amend Complaint [Doc. 41], he first notes that a real party in interest is

"the person who possesses the rights sought to be enforced [Doc. 41 @ III. A., page 7]. He then asserted:

> "WBI Investment Club is the real party in interest…. [Id.]"

This assertion is an admission that Mr. Harris does not possess the claims he seeks to recover. For that reason alone, summary judgment should be granted against him.

**b.      The Temporal Impossibility of the Plaintiff's Allegations.**  Mr. Harris claims that a cease and desist order issued two months <u>after he liquidated his funds</u> caused him to liquidate his funds, *supra*. Such nonsensical allegations cannot resist summary judgment.

**c.      Undisputable facts disprove the Plaintiff's contention.** First, the order itself disproves the Plaintiff's contentions. Its operative paragraph provides only that Mr. Harris should "cease and desist from further offers or sales of any security into, within or from the State of Alabama, *supra*." The Plaintiff rails over this order, but he cannot even contend that he was entitled to do that simple thing that he was ordered not to do. He was not qualified to sell securities, and an order not to do so could not conceivably cause him harm.

As conclusively demonstrated by the attachments to the Borg Affidavit [Ex. One Borg Aff.] and the Foley Affidavit [Ex. Two Foley Aff.], the Defendant did not cause the liquidation about which Mr. Harris complains. Mr. Harris and his attorneys did. The Court has this fact in Mr. Harris' own words from his fax to Mr. Foley:

> "I am writing you [Mr. Foley] in an attempt to shed some light on my attempt to voluntarily do a quiet recission of principal and interest earned in the investment club formerly known as Wealth Builders International. [Ex. Two Foley Aff. Attachment 7 lines 1-3]."

The Court has the proof that Charles Schwab had told Mr. Harris it was closing his accounts several months before the liquidation [Ex. One Borg Aff. Attachment 5]. The Court has the order to liquidate from Mr. Harris [Ex. One Borg Aff. Attachment 4], and it has the letter from Mr. Harris' attorney instructing Schwab to liquidate [Ex. One Borg Aff. Attachment 3].

**2. Immunity of Defendant Borg.**    In addition to his fact-based grounds, Mr. Borg is entitled to absolute 11th Amendment immunity from any monetary claims made as to any acts taken in his official capacity. He is also entitled to qualified immunity as to any acts taken in his individual capacity as Director of ASC.

**a. Absolute Immunity.**    The Eleventh Amendment prohibits Plaintiff's § 1983 action seeking compensatory and punitive damages against Joseph Borg in his official capacity.  *See Taylor v. Alabama*, 95 F. Supp. 2d 1297, 1311 (M.D. Ala. 2000); *Wright v. Butts,* 953 F.Supp. 1352, 1358 (M.D. Ala. 1996).  "Lawsuits against a state official in his or her official capacity are suits against the state when 'the state is the real, substantial party in interest.'" *Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1524 (11th Cir. 1990). The Eleventh Amendment bars suits by private parties "seeking to impose a liability which must be paid from public funds in the state treasury."  *See Edelman v. Jordan*, 415 U.S. 659, 663 (1974).  This rule applies not only in suits against the state but also against a "state agency or instrumentality."  *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985).The Courts have determined that this rule of immunity applies regardless of whether the action is instituted against a state, a state agency or instrumentality, or a state official.  *Id*.    Based on these principles, the court should find that Plaintiff's § 1983 claims for compensatory and punitive damages against Joseph Borg in his official capacity are due to be dismissed.

**b. Qualified Immunity.**

**i. Section 1983.**  When a government official is sued in his individual capacity for money damages based on alleged civil rights violations, he may posit an affirmative defense of qualified immunity.[1]  *See Swint v. City of Wadley, Ala.,* 51 F.3d 988, 994 (11th Cir. 1995). The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow,* 457 U.S. at 818; *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir. 1988).   In the present case, Plaintiff has failed to come forward with any evidence of any constitutional deprivation.  Plaintiff cannot point to a controlling or factually similar case because Plaintiff has no evidence that Joseph Borg committed a constitutional violation.  Thus, Plaintiff has failed to make a *prima facie* case for § 1983 liability against Defendant in his individual capacity.

**ii. 14th and 5th Amendments.**      In addition to his § 1983 claims, Plaintiff has also failed to make a *prima facie* case based on the equal protection clauses of the Fourteenth and Fifth Amendments of the Constitution.  He claims that this is a suit for race discrimination [Ex. One Borg Aff. Attachment 2 ¶ 1], but he offers the Court nothing more than his racial identity to substantiate that claim. To establish an equal protection claim, a plaintiff must show

---

[1]    To the extent that Plaintiff's § 1983 claims seeking injunctive relief apply to Joseph Borg in his individual capacity, which is not apparent on the face of Plaintiff's Complaint, they should be dismissed based on qualified immunity.

that he is similarly situated to others who received more favorable treatment, and that his adverse treatment was based on some constitutionally protected interest such as race. *See Jones v. Ray,* 279 F.3d 944, 947 (11th Cir. 2001) (finding that elements of equal protection claim include differential treatment from others similarly situated, and intentional discrimination). A plaintiff raising an equal protection claim must still show intentional differences in treatment from others similarly situated to him. *See Jones,* 279 F.3d at 947 (dismissing equal protection claim when even liberal interpretation of the Complaint did not reveal any factual basis for equal protection claim); *Anderson v. Greene*, 2005 WL 3058095 *5 (S.D. Ala. 2005) (granting defendant's motion to dismiss plaintiff's Fourteenth Amendment equal protection claim due to absence of factual support).

   **iii. Equal Protection.**    With regards to Plaintiff's § 1983 Fourteenth Amendment equal protection claim, Plaintiff alleged that Joseph Borg violated the Constitution "by violating Plaintiff's clearly established rights to have a procedural due process hearing before the taking of their property [Ex. One Borg Aff. Attachment 2 ¶ 17]."   A review of the Complaint reveals that Plaintiff's equal protection allegations are plainly lacking.  Plaintiff has not indicated that anyone is similarly situated to him, much less identified those persons. Nor has he explained the manner in which he believes that he was subjected to disparate treatment (*e.g.,* because of his race).  Not only are Plaintiff's allegations lacking, but Plaintiff has not come forward with a single piece of evidence of disparate treatment in any act he claims caused the liquidation.   Plaintiff cannot point to a similarly situated individual who was treated more favorably because none exist. Thus, Plaintiff fails to make a *prima facie* case based on the equal protection clause of the Fourteenth Amendment.  In his affidavit, the Defendant points out that he had no personal knowledge of Mr. Harris when the investigation began and that, in his thirteen years as Director

9

of ASC, '[t]he vast majority of those investigations [conducted by his office] have been of persons whose race was other than African American [Ex. One Borg Aff. ¶¶ 3 and 4]. In Exhibit Two, Mr. Foley points out that the two investigators who handled Mr. Harris' case were both African American [Ex. Two Foley Aff., ¶ k].

      **iv. Due Process.**     Plaintiff's claims should also be dismissed to the extent that they allege violations of Fifth Amendment due process rights. The Fifth Amendment's due process clause does not extend to state and local governments, but is instead confined to the federal government.  To the extent that Plaintiff is seeking to bring a separate, distinct Fifth Amendment due process claim against Defendant, Plaintiff's claims are due to be dismissed.  *See Riley v. Camp,* 130 F.3d 958, 972 n. 19 (11th Cir. 1997) ("The Fifth Amendment obviously does not apply here - the acts complained of were committed by state rather than federal officials."); *Dowdell v. Chapman,* 930 F. Supp. 533, 542 (M.D. Ala. 1996) ("The Fifth Amendment's Due Process Clause applies only to the federal government.").  Thus, Plaintiff fails to make a *prima facie* case based on the equal protection clause of the Fifth Amendment.

      **B.     Considering the Un-pled Allegations.**

      In Plaintiff's proposed pretrial order [not filed and obviated by the Court's order allowing this motion], Plaintiff makes certain allegations not made in the Complaint before this court. The Defendant anticipates that the Plaintiff will attempt to do the same thing in his response to this motion. The Defendant strongly objects to his being allowed, in effect, to amend his Complaint in this fashion after the Court has denied his motion to amend, a tactic akin to his failed attempt to resurrect his class action after it was denied. Additionally, the Defendant asserts the following:

      **a. A claim that the Defendant issued an "Order to Liquidate" ordering Harris to liquidate the stock and option positions.**  Apparently, finally accepting that the June 10, 2003

cease and desist order could not have caused Mr. Harris' April 15, 2003 instruction to Charles Schwab to liquidate, Plaintiff may try to contend that a letter from John M. Foley to Schwab [Ex. Two Foley Aff. Attachment 10] did so. That letter did no such thing. It is not addressed to Mr. Harris, and it contains no "order."   Further, it was sent by someone other than the sole defendant in this case, Mr. Borg.  It was sent by Mr. Foley to Schwab on the same day that Mr. Foley wrote Mr. Harris' attorney, Mr. Chambless, confirming their negotiations [Ex. Two Foley Aff. Attachment 9] and it specifically states, "The Commission has agreed to a plan whereby, under the supervision and coordination of Mr. Harris' attorney…the positions held by Wealth Builders International will be liquidated *by Mr. Harris* [*emphasis added*, Ex. Two Foley Aff. Attachment 10]." If, in the alternative, Mr. Harris attempts to claim that the letter to Mr. Chambless of the same date, mentioned immediately above, was "an order to liquidate" he meets the same problems. It is not from Mr. Borg, and it contains no "order." Mr. Foley ends it, "Thank you for your cooperation, and I look forward to working with you to resolve this problem [Ex. Two Foley Aff. Attachment 9]." It is a memorandum of the negotiations that were taking place, not an order. Sometimes, Mr. Harris tries to combine the cease and desist order with one of the above to create a liquidation order, but two potatoes do not make an orange.

**b.    An allegation that the cease and desist order caused a loss in the value of the securities.** The funds from the liquidation were received by Mr. Harris's attorneys and placed in a trust account under their control. The losses in the Schwab accounts had to have occurred before the liquidation and long before the cease and desist order. Here, like Arthur Conan Doyle's hound that didn't howl [*The Hound of the Baskervilles*], ASC offers a compelling absence of proof. ASC told Harris to liquidate at the most opportune time [*Id.*]. Where are the letters to ASC from Harris or his attorneys claiming that he was being forced into an involuntary

liquidation that was going to cause losses? There are not any such letters because he was voluntarily liquidating with the advice of his counsel to try to minimize his criminal exposure.

      **c.**      **An allegation that the Defendant took possession of over two million dollars without proper notices and hearings.**      The funds in question are the subject of a written agreement between Mr. Harris' entities and the ASC. It is not an agreement with Mr. Borg [Ex. Two Foley Aff. Attachment 11]. Mr. Harris' signature is on the agreement in three places signifying his consent and agreement. The funds were not Mr. Harris' and were returned *pro rata* to the investors with his agreement [Ex. Two Foley Aff. ¶ m] and were never in Mr. Borg's possession.

      **d. An allegation that Mr. Harris was ordered to repay the members of Wealth Builders $1.6 Million.** This allegation has nothing to do with ASC and nothing to do with Mr. Borg. Mr. Harris was ordered to repay the investors the $1.6 Million of their funds that he spent or lost *by the Circuit Court of Montgomery County in connection with his guilty plea to securities violations.* Because of the uncertain status of that guilty plea, it is not clear that any such order still exists against him. Certainly, the Plaintiff has the burden of proof, not just assertion, that there is. Whether or not such an order exists, it was not issued by Mr. Borg and cannot be laid at Mr. Borg's feet.

      **e. An allegation that defendant willfully and/or recklessly disseminated false information about the plaintiff.**      Here, the Defendant cannot even anticipate. They bear no relation to the Plaintiff's Complaint and the Defendant has no idea where these allegations come from. Mr. Borg simply has to object to the belated addition of them.

In conclusion, there are no genuine issues of fact, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Joseph Borg respectfully moves this Court to dismiss the Plaintiff's claims with prejudice and grant Defendant's Motion for Summary Judgment.

s/Bruce J. Downey, III
**BRUCE J. DOWNEY, III**
**ASB-9205-W86B**
*ATTORNEY FOR DEFENDANT JOSEPH P. BORG, ESQ.*

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama  36102-2069
Telephone:    (334) 241-8000
Facsimile:     (334) 323-8888

Jane Brannan, Esq.
Alabama Securities Commission
770 Washington Ave., Ste. 570
Montgomery, AL  36130-4700
Telephone:    (334) 353-4690

## CERTIFICATE OF SERVICE

I hereby certify that on this the 30th day of May, 2007, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Henry L. Penick, Esq.
H. L. Penick & Associates, P.C.
P O Box 967
Birmingham, AL  35201-0967

s/Bruce J. Downey, III
**OF COUNSEL**

13

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRY HARRIS, DOROTHY WATFORD, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO: 2:05CV1083-WKW-TFM** |
| | ) | |
| **JOSEPH BORG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### AFFIDAVIT OF JOSEPH P. BORG

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| **MONTGOMERY COUNTY** | ) |

     Joseph P. Borg, being first duly sworn, deposes and says:

     1.     I am Joseph P. Borg, Defendant is the above-styled case. I make this affidavit under oath in support of my Motion for Summary Judgment. I am an attorney admitted to practice before this court.  I am over the age of nineteen (19) years and submit this affidavit based upon personal knowledge.

     2.     I am the Director of the Alabama Securities Commission ["ASC"], a state agency charged with the enforcement of Alabama's securities laws. I am the chief administrative officer of the agency, but I serve under the direction of the Commission. I supervise numerous employees including an investigative division. I rely on the facts and recommendations brought to me by my staff.

     3.     I had no personal knowledge of the Plaintiff, Terry Harris, until it was reported to me that our office had received a complaint of possible securities violations on his part from an outside individual. That complaint was given to a member of our investigative staff, Special Agent Rueben Redd, in the normal course of business. At the time the complaint was given to Mr. Redd, I had no knowledge of Mr. Harris' race. However, coincidentally, Mr. Redd, like Mr. Harris, is African American. From that first time to this date, I have handled all matters involving Mr. Harris based on the facts and recommendations made to me by Mr. Redd and his successors and by my departmental legal staff. I have not undertaken any investigation of my own, and all of my actions have been consistent with the recommendations I have received from my staff.

     4.     Mr. Harris' race has not played any part in my actions regarding him. In my thirteen years as Director of ASC, I have been involved in numerous investigations of

**EXHIBIT**

ONE

possible securities law violations. The vast majority of those investigations have been of persons whose race was other than African American.

5.      Mr. Harris' complaint complains primarily of one (or, possibly, two) alleged action(s) on my part. In Paragraph 13, he avers:

> "13. On or about April 17, 2003, Defendant, Joseph Borg, individually, and in its [sic] capacity as Commissioner of the Alabama Securities Commission issued a Cease and Desist Order and caused Plaintiff, Terry Harris, to send a letter to Charles Schwab, Incorporated to liquidate the stock and option positions in Wealth Builders International account #8172-3879." [Note: This account number should be #8172-3979.]

> "14. On or about April 18, 2003, *as a result of said Cease and Desist Order* [emphasis added], Defendant, Joseph Borg, individually and in its [sic] capacity as Commissioner of the Alabama Securities Commission ordered and caused Plaintiff, Terry Harris, in its [sic] capacity as president and CEO of Networker 2000.com, Inc. to liquidate all stock and option positions held at Charles Schwab, Incorporated in the Infinity 200 account # 4628-5537."

Obviously, the issuance of a Cease and Desist order is one action, but in case Mr. Harris contends that I separately "caused" the letter to Schwab and the liquidation of the Infinity account, I will treat his averment as being of two actions.

6.      The Cease and Desist order issued against Mr. Harris (and several other persons and entities) is attached hereto as Attachment 1. First, it is obvious that this order did not and could not have caused the letter to Schwab or the instruction to liquidate the Infinity account. That liquidation instruction to Schwab was sent on April 18, 2003 [See the Allegations of Paragraph 14 of Harris' complaint and Attachment 2], almost two months before the Cease and Desist order was issued on June 10, 2003 [Attachment 3]. Attachment 4 is a letter dated April 18, 2003 from Mr. Harris' attorney, Andrew R. Chambless. Attachments 3 and 4 show that it was Mr. Harris and his attorney who caused the liquidation of the Schwab accounts, not I.  Attachment 5 is a letter from Charles Schwab, dated January 17, 2003 to Mr. Harris. This letter shows that Schwab exercised its rights "… to close your Schwab Account … effective January 31, 2003. numbers 8172-3979 and … 4628-5537…." Thus, almost six months before the Cease and Desist order, Schwab was closing these accounts, not I.

7.      The cease and desist order is signed by me as Director of the Alabama Securities Commission. It is issued by the ASC, not by me.

8.      Concerning the Cease and Desist order and every other action I took in connection with Mr. Harris, I acted in my official capacity, as a discretionary function of my office, subject to the Commission's approval. I have no power or authority to issue

any order in my individual capacity and I did not do so. There is no basis for suing me in my individual capacity.

9.    Specifically concerning the letters to Schwab, every action I took in connection with the fact that these accounts were being closed was taken in my official capacity, as a discretionary function of my office, subject to the Commission's approval. I have no power or authority to issue any order or require any liquidation in my individual capacity and I did not do so. I understood and approved of the fact that these accounts were being liquidated as a device to make a partial return to Mr. Harris' investors. I understood that Mr. Harris was taking this action on the advice of his attorneys in order to try to avoid prosecution for securities violations, but I did not "order" the liquidation of these accounts in any capacity. Mr. Harris chose to take these actions on the advice of his counsel to try to limit his civil and criminal liability. I later entered into an agreement on behalf of the commission (and not in any individual capacity) with Mr. Harris concerning the handling of the funds received from the liquidations as they were to be transmitted to the investors as a *pro rata* return. That agreement, dated September 30, 2003, is attached as Attachment 5 and shows that Mr. Harris agreed with the return of these funds to the investors on behalf of all of his entities.

10.    I have dealt with Mr. Harris only as Director of the ASC. I have dealt with him as my duties dictated. Deciding whether to issue a cease and desist order is a regular part of my duties for which I must perform due to the position I occupy. In fact, I am not aware that Mr. Harris even contests that signing such orders on the Commission's behalf is a regular part of my discretionary duties. If he does, I am at a loss as to any basis for doing so. In the case of Mr. Harris, I relied upon the facts uncovered by my investigative department and the conclusions and recommendations of my legal staff. My investigators determined that Mr. Harris was not a licensed securities dealer and had collected funds and made trades for others in violation of Alabama's securities laws. My cease and desist order was very limited. It provided only that he "… CEASE AND DESIST from further offers or sales of any security into, within or from the State of Alabama." I do not understand Mr. Harris to contend that he was or is entitled to offer or sell any security into, within or from the State of Alabama. I believe that his contention was that he had been doing did not constitute an offer or sale of securities. He was wrong in that contention, but if he had been correct, the cease and desist order would have had no effect on him since that is all it instructed him to avoid.

Joseph P. Borg

Sworn to and subscribed before me on this the 2<u>9th</u> day of May, 2007.

(SEAL)

NOTARY PUBLIC
My Commission Expires: 3/24/10

# ATTACHMENT 1

STATE OF ALABAMA
ALABAMA SECURITIES COMMISSION


IN THE MATTER OF:      )
     )
TERRY HARRIS      )       ADMINISTRATIVE ORDER
PATRICIA MONROE TONEY      )       NO.CD-2003-0012
HULBERT VAN R BARRINGER      )
SUSAN DIANE BARRINGER      )
ANTHONY TALLEY JR      )
NETWORKER2000.COM INC.      )
Also Known As:      )
NETWORKER2000      )
WEALTH BUILDERS      )
 INTERNATIONAL INVESTMENT      )
 CLUB      )
Also Known As:      )
WEALTH BUILDERS      )
 INTERNATIONAL INVESTMENT      )
 CLUB INC      )
Also Known As:      )
INFINITY 2000 INVESTMENT      )
 GROUP AND INVESTMENT CLUB )
N2K INVESTMENT CLUB      )
     )
     RESPONDENTS      )


<u>CEASE AND DESIST ORDER</u>


    The Alabama Securities Commission ("Commission"), having the power to administer and provide for the enforcement of all provisions of Title 8, Chapter 6, <u>Code of Alabama 1975</u>, the Alabama Securities Act ("Act"), upon due consideration of the subject matter hereof, and having confirmed information of the offer and sale of securities into, within, or from the State of Alabama, has determined as follows:


**Exhibit One, Attachment 1**

<u>RESPONDENTS</u>

1.     TERRY HARRIS ("HARRIS"), is represented to be the president/co-owner of WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB, WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB, INC., and N2K INVESTMENT CLUB, with business addresses of 107-B David Green Road, Hoover, AL 35244, and 8315-E 1st Avenue North, Birmingham, AL 35206.

2.     PATRICIA MONROE TONEY ("TONEY"), is represented to be a co-owner of WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB, with business addresses of 107-B David Green Road, Hoover, AL 35244, and 8315-E 1st Avenue North, Birmingham, AL 35206.

3.     HULBERT VAN R BARRINGER ("HULBERT BARRINGER"), is represented to an employee of WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB with a business address of 107-B David Green Road, Hoover, AL 35244.

4.     SUSAN DIANE BARRINGER ("SUSAN DIANE BARRINGER"), is represented to an employee of WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB with a business address of 107-B David Green Road, Hoover, AL 35244.

5.     ANTHONY TALLEY JR ("TALLEY"), is represented to be an employee/agent of WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB with a home address of 805 Northcrest Drive, Birmingham, AL 35235.

6.     NETWORKER 2000.COM INC. ("N2K"), is represented to be an Alabama Corporation with a business address of 8315-E 1st Avenue North, Birmingham, AL 35206.  N2K is also known as NETWORKER2000.

7.    WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB ("WBI"), is represented to be a susidiary of N2K and a privately owned investment club with a business address of 107-B David Green Road, Hoover, AL 35244. WBI also has a business address of 8315-E 1st Avenue North, Birmingham, AL 35206. WBI has also been known as WEALTH BUILDERS INTERNATIONAL INVESTMENT CLUB, INC., and INFINITY 2000 INVESTMENT GROUP AND INVESTMENT CLUB ("INFINITY").

8.    N2K INVESTMENT CLUB ("N2K INVESTMENT"), is a susidiary of N2K and represented to be a privately owned investment club with a business address of 8315-E 1st Avenue North, Birmingham, AL 35206.

## STATEMENT OF FACTS

9.    N2K is an internet web hosting service in which HARRIS, TONEY, HULBERT BARRINGER, SUSAN BARRINGER, and TALLEY solicited investment opportunities by the use of seminars, meetings and internet web pages. In addition to joining N2K, members who recruited three (3) other individuals to join N2K were then eligible to become members of WBI.

10.    The Commission is in receipt of information that HARRIS, TONEY, HULBERT BARRINGER, and SUSAN BARRINGER solicited investment opportunities in WBI a private investment club, through seminars, meetings and internet web pages. HARRIS and TONEY engaged in the offer and/or sale of investment contracts to investors, involving membership interests in WBI, that were neither registered nor exempt from registration, into within and from the state of Alabama.

11.    HARRIS also engaged in the offer and/or sale of investment contracts to investors, involving membership interests in N2K INVESTMENT that were neither registered nor exempt from registration, into within and from the state of Alabama.

12.    From December 1, 1999, through approximately August 2002, HARRIS and TONEY received INFINITY, WBI, and N2K INVESTMENT investor funds at N2K's office located in Birmingham, AL. They deposited the investor's funds either into INFINITY's Charles Schwab account, WBI's Charles Schwab account, N2K INVESTMENT Charles Schwab account, or into N2K's main business operating bank account located at AmSouth Bank Birmingham, AL.

13.    Beginning January 2002, HARRIS co-mingled investor funds pertaining to INFINITY, WBI, and N2K INVESTMENT depositing them in N2K's main operating business account located at AmSouth Bank, Birmingham, AL.

14.    TALLEY was employed by HARRIS to create and maintain the computer program utilized by WBI to calculate the monthly earnings of investors who invested in WBI's Charles Schwab investment accounts.    Additionally, TALLEY entered the data provide to him by HARRIS into the computer program that was utilized to calculate the monthly returns of investors.  TALLEY would then post the returns on the individual investor's web pages. Also, TALLEY acted as an agent of WBI by soliciting investment opportunities in WBI, through his participation in presentations conducted at seminars, and meetings.

15.    From May 16, 2002, to present HARRIS and HULBERT BARRINGER, who have sole authority of the WBI Charles Schwab trading account, conducted securities transactions in the form of straight stock options and covered calls stock options trades, acting as account representatives of WBI without benefit of input from the investors.

16.    From Approximately August 2002, HULBERT BARRINGER and SUSAN BARRINGER received WBI investor's funds at a Post Office Box located in Birmingham, AL.  They deposited the investor's funds either into WBI's Charles Schwab account, WBI's bank account at AmSouth Bank Birmingham, AL, or into HULBERT BARRINGER's personally controlled account held at BankcorpSouth Bank, Birmingham, AL in the name of Health Quest.

17.    WBI's investors relied on the expertise and managerial efforts of HARRIS and HULBERT BARRINGER to realize a profit from their WBI investments.

18.    HARRIS, TONEY, HULBERT BARRINGER, and SUSAN BARRINGER acting as agents or brokers of WBI, did obtain physical control of investment funds, and placed monies from investors into securities accounts held at Charles Schwab, account number 8172-3979 in the name of WBI, and account number 4628-5537 in the name of INFINITY, thereby creating a blind pool investment fund.

19.    Results from the WBI trading conducted by HARRIS and HULBERT BARRINGER would then be placed on the individual investor's web pages, which is maintained by another HARRIS owned entity known as N2K.  Although an analysis of the trading accounts shows only three months of positive earnings (profits) resulting from the trades conducted by HARRIS and HULBERT BARRINGER, the computation represented to the investors on each individual web page depicts profits being realized by the investor each month, even when losses occurred in the trading accounts.

20.    When returns are requested to be paid out to the investor, the actual funds were withdrawn from the Charles Schwab trading account and then placed into the WBI bank account at AmSouth Bank, Birmingham, AL, and a check was then issued to the investor.  The majority of the returned funds to investors were actually monies paid into the program by previous investors, not the results of profits earned through trading by HARRIS and HULBERT BARRINGER.  HARRIS and HULBERT BARRINGER are the only individuals authorized to disburse funds from this account.

21.     A review of the registration files of the Commission, disclosed no record of the registration for HARRIS, TONEY, HULBERT BARRINGER, SUSAN BARRINGER, and TALLEY, as securities agents or dealers in the state of Alabama

22.     A review of the registration files of the Commission, disclosed no record of registration, or exemption from registration, of the securities mentioned in paragraph 10 and 11 of WBI and N2K INVESTMENT.

## CONCLUSIONS OF LAW

23.     HARRIS, TONEY, HULBERT BARRINGER, and SUSAN BARRINGER, acted as securities agents and/or broker dealers of WBI, N2K, INFINITY, and N2K INVESTMENTS, by collecting funds from investors for the purpose of investing with an expectation of receiving a profit, without benefit of registration in violation of Section 8-6-3(a), Code of Alabama, 1975.

24.     TALLEY offered/sold the securities of WBI, without benefit of registration in violation of Section 8-6-4(1), Code of Alabama, 1975.

25.     By allowing unrealized profits to be paid to some investors by utilizing other investor funds, and by posting and/or allowing the posting of unrealized profits to the web pages belonging to the investors, HARRIS, TONEY, and TALLEY employed a device and/or scheme to defraud by engaging in a course of business which operated as a fraud or deceit upon investors in violation of Section 8-6-17(a)(1)(2)(3), Code of Alabama, 1975.

This Order does not prevent the Alabama Securities Commission from seeking such other civil or criminal remedies that are available to it under the Alabama Securities Act.

This Order is appropriate in the public interest for the protection of investors and consistent with the purpose of the Alabama Securities Act.

**ACCORDINGLY, IT IS HEREBY ORDERED** that RESPONDENTS immediately **CEASE AND DESIST** from further offers or sales of any security into, within, or from the State of Alabama.

Entered at Montgomery, Alabama, this ___10th___ day of ___June___, 2003.



ALABAMA SECURITIES COMMISSION
770 Washington Street, Suite 570
Montgomery, Alabama 36130-4700
BY:

JOSEPH P. BORG
Director

# ATTACHMENT 2

FILED
U.S. DISTRICT COURT
N.D. OF ALABAMA

2009 Apr 19 AM 11:27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

05 APR 18 PM 5: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

CV-05-TMP-0814-S

| | |
|---|---|
| TERRY HARRIS, DOROTHY WATFORD, and the class of independent representatives in Networker 2000.Com, Inc. and Wealth Builders International, | ) ) ) ) ) |
| PLAINTIFFS, | ) ) |
| V. | ) ) |
| JOSEPH BORG, individually and in his capacity, as Commissioner of the Alabama Securities Commission, | ) ) ) ) |
| DEFENDANT. | ) ) |

CASE NO.:

JURY TRIAL DEMANDED

## COMPLAINT

### I. JURISDICTION

1. This suit is a suit for race discrimination authorized and instituted pursuant to the Civil Rights Act of 1871, 42 U.S.C. Section 1983 and the Fifth and Fourteenth Amendments to the United State Constitution. The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by statutes, and 42 U.S.C. Section 1983, and the Fifth and Fourteenth Amendments of the United State Constitution, providing for injunctive, damages and other relief for violations of rights secured therein. Further, the jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections 1331, 2201 and 2202.

2. The principal residents of the named Plaintiffs and the principal place of business of Networker 2000.com, Inc., Wealth Builders International and Infinity 2000 is Jefferson County, Alabama. The property taken by Defendant was located in Jefferson County, Alabama.

Exhibit One, Attachment 2

## II.  PARTIES

3. Plaintiff, Terry Harris, is an African-American citizen of the United States, and is the President and CEO of Networker 2000.com, Inc. and said plaintiff had an interest in Wealth Builder International and Infinity 2000.

4. Plaintiff, Dorothy Watford, is an African-American citizen of the United States, was an independent representative of Networker 2000.com, Inc. and had and interest in Wealth Builders International and Infinity 2000.

5.  Plaintiffs aver that the class they represent is so numerous that joinder of all members is impractible.

6.  There are questions of law or fact common to members of the class.

7.  The claims of the representative party are typical of the claims of the class.

8.  The named plaintiffs will fairly and adequately protect the interest of the class.

9.  The defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Rule 23(b)(2).

10.  The questions of law or fact common to members of the class predominate over any questions effecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, herein.

11.  Defendant, Joseph Borg, is Commissioner of Alabama Securities Commission.  The defendant is also a person subject to suit under the provisions of the Civil Rights Act of 1871, 42 USC 1983, and the Fifth and Fourteenth Amendments of the Constitution of the United States.

## III.  CAUSES OF ACTION

### COUNT I:

12. The plaintiffs re-allege and incorporates by reference paragraphs 1-11 above with the same force and effect as if fully set out in specific detail herein below.

13. On or about April 17, 2003, Defendant, Joseph Borg, individually, and in its capacity as Commissioner of the Alabama Securities Commission issued a Cease and Desist Order and caused Plaintiff, Terry Harris, to send a letter to Charles Schwab, Incorporated to liquidate the stock and option positions in Wealth Builders International account #8172-3879.

14. On or about April 18, 2003, as a result of said Cease and Desist Order, Defendant, Joseph Borg, individually, and in its capacity as Commissioner of the Alabama Securities Commission, ordered and caused Plaintiff, Terry Harris, in its capacity as President and CEO of Networker 2000.com, Inc. to liquidate all stock and option positions held at Charles Schwab, Incorporated in the Infinity 2000 account, #4628-5537.

15. As a result of said Cease and Desist Order and Order to Liquidate said accounts, Plaintiffs and the class represented by Plaintiffs suffered lost of their interest in said accounts.

16. Plaintiffs aver that the liquidation of said accounts were done at substantial lost and amounted to a taking of their property.

17. Plaintiffs assert that the Cease and Desist Order and the Order to Liquidate violated the Civil Rights Act of 1877, 42 USC Section 1983, and the Fifth and Fourteenth Amendments of the United States Constitution by violating Plaintiffs clearly established rights to have a procedural due process hearing before the taking of their property.

### IV. PRAYER FOR RELIEF:

Wherefore plaintiffs respectfully pray that this court take jurisdiction of this action and after trial:

1. Grant Plaintiffs and the class they represent a declaratory judgement holding that the actions of the defendant described herein above violated and continue to violate the rights of the plaintiff and the class he represents as guaranteed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the Fifth and Fourteenth Amendments of the United States Constitution.

2. Grant plaintiffs and the class they represent a permanent injunction enjoining the defendant, its agents, successors, employees, attorneys and those acting in concert with the defendant and at the defendant's request from continuing to violate the Civil Rights Act of 1871, 42 U.S.C. Section 1983 and the Fifth and Fourteenth Amendments of the United States Constitution.

3. Enter an order requiring the defendant to make the plaintiffs and the class they represent whole by awarding compensatory damages (including mental anguish damages), punitive damages, costs, attorneys fees and expenses.

Respectfully submitted,

Terry Harris

Dorothy Watford

**Plaintiff's Address**
Terry Harris
Dorothy Watford
8315-E 1st Avenue, North
Birmingham, Alabama 35206

**Defendant's Address**
Joseph Borg
Alabama Securities Commission
770 Washington Avenue
Montgomery, AL 36104

# ATTACHMENT 3



**BERKOWITZ**
**LEFKOVITS**
**ISOM &**
**KUSHNER**
A PROFESSIONAL CORPORATION

ANDREW R. CHAMBLESS
ATTORNEY AT LAW
DIRECT DIAL NO.: (205) 250-8314
E-MAIL: ACHAMBLESS@BLK.COM
WEBSITE: WWW.BLK.COM

April 15, 2003

<u>VIA FACSIMILE</u>
<u>AND FIRST-CLASS MAIL</u>

Stephen Murphy, Esq.
Charles Schwab & Co., Inc.
101 Montgomery Street
MS: 101 Mont-23-246
San Francisco, CA 94104

Re:     Wealth Builders International Investment Club
        Account Number: 8172-3979

Dear Steve:

In accordance with the liquidation procedures detailed in the letter from the Alabama Securities Commission to Warren Dreher dated April 1 (the "Liquidation Plan") and pursuant to the Letter of Authorization from Terry Harris enclosed herewith, Charles Schwab & Co., Inc. is hereby requested, on behalf of Mr. Harris, Networker2000, Inc. and Wealth Builders International, to liquidate at market on Thursday, April 17, 2003, during the opening of the market day, all stock and option positions in the above-referenced account.

The Liquidation Plan provides that the Alabama Securities Commission must approve the liquidation of each position in the Wealth Builders account. A space has been provided below for Commission approval.

We appreciate your assistance in execution of the Liquidation Plan.

Sincerely,

*Andrew Chambless*

ANDREW R. CHAMBLESS

ARC/ms
Enclosure
cc:     Mr. John M. Foley
        Mr. Terry Harris

_____

EXECUTION OF THE ABOVE REQUESTED TRANSACTIONS IS HEREBY APPROVED
BY THE ALABAMA SECURITIES COMMISSION.

Name: *John M Foley*          Date: *4/16/03*
Title: *Manager of Investigations*     Tel. No.: *334/242-23* Exhibit One, Attachment

577231v1
038092-000001

_____

SOUTHTRUST TOWER · 420 20TH STREET NORTH, SUITE 1600 · BIRMINGHAM, ALABAMA 35203-5202 · TELEPHONE: (205) 328-0480 · FAX: (205) 322-8007

# ATTACHMENT 4

LETTER OF AUTHORIZATION

April 15, 2003

To:    Charles Schwab
From:  Terry Harris, President & CEO/Networker2000.com

To whom it may concern:

I, Terry Harris, President & CEO of Networker2000.com do hereby authorize Charles Schwab to liquidate all stock and option positions in the Wealth Builders International account, 8172-3879, at market price on Thursday, April 17, 2003 during the opening of the market day, around 9:30 AM EST

If you have any questions concerning the liquidation of these positions call me at (205) 836-2910.

Terry Harris

President & CEO/Networker2000.com

**Exhibit One, Attachment 4**

# ATTACHMENT 5

*charles* SCHWAB

Office of Corporate Counsel
101 Montgomery Street  San Francisco  CA 94104
tel (415) 627 7000

WRITER'S DIRECT DIAL
(415) 636-3763
WRITER'S FACSIMILE
(415) 636-5235

January 17, 2003

**VIA UPS**

Terry Harris
H. Van Barringer
Wealth Builders International
107 David Green Rd. Suite B
Hoover, AL 35244

RE:    Unauthorized Use of Charles Schwab & Co.'s Name

Dear Sirs:

It has recently come to the attention of Charles Schwab & Co. ("Schwab") that Schwab's name is used to endorse your group's investment services in seminars given by representatives of Wealthbuilders International.  We are also informed that you may be using Schwab's name in printed materials distributed at your seminars.

The unauthorized use of Schwab's name in presentations and printed materials clearly violates the Schwab trademark and trade name, which are the exclusive property of The Charles Schwab Corporation, and its subsidiaries.  These marks are registered trademarks of our company and, as such, are protected by intellectual property laws. Your use of the Schwab trademark without our express permission gives rise to numerous state and federal violations.  In addition, this use erroneously indicates an affiliation with Schwab which is misleading to those who attend your seminars.  Therefore, Schwab demands that you immediately cease using any form of the Schwab trademarks and that you remove all references to Schwab from your printed materials.

Furthermore, Schwab is exercising its right, pursuant to the Account Agreement, to close your Schwab Account numbers 8172-3979 and related accounts 3224-7239, 4628-5537, 8173-0979, 8673-7241 effective January 31, 2003.

**Exhibit One, Attachment 5**

105284-1

Charles Schwab & Co, Inc. Member: SIPC / New York Stock Exchange and Other Principal Stock and Options Exchanges.

RECEIVED TIME      FEB. 13.      6:54PM          PRINT TIME   FEB. 13.      7:02PM

Terry Harris
H. Van Barringer
January 17, 2003
Page 2

*charles* SCHWAB

    In order to facilitate the closing process, we ask that you meet the deadlines set forth below. Effective January 31, no new account purchases of any kind will be permitted. You will only be permitted to liquidate existing positions in each of the accounts. All account assets, including any cash, stock and mutual fund holdings, must be transferred to another institution or withdrawn from your Schwab account on or before February 17, 2003. All normal Schwab fees and charges will apply.

    If any assets remain in your account after February 17, 2003, Schwab will mail a check for the cash and money market holdings to the address of record for the account. For assets that can be issued to you in certificate form, a certificate (registered as the Schwab account is registered) will be mailed to the address of record for the account. Schwab will charge a $50.00 fee for each certificate issued. Finally, for assets that cannot be issued in certificate form, Schwab reserves the right to sell those positions and mail a check for the sale proceeds (less commissions and other applicable charges) to the address of record for the account.

    Thank you for your attention to this matter.

                    Sincerely yours,

                    Steve Murphy
                    Corporate Counsel

cc:    Terry Harris
       2909 Highland Ave.
       Apartment 307
       Birmingham, AL 35205

105284-1

Charles Schwab & Co. Inc. Member SIPC / New York Stock Exchange and Other Principal Stock and Options Exchanges.

RECEIVED TIME    FEB. 13.    6:54PM      PRINT TIME    FEB. 13.    7:02PM

# ATTACHMENT 6

# AGREEMENT REGARDING
## WEALTH BUILDERS INTERNATIONAL FUNDS

This agreement made this _30_ day of _September_, 2003, between the Alabama Securities Commission (hereinafter referred to as the "ASC" or the "Commission"), Wealth Builders International (hereafter referred to as "WBI"), Networker2000.com, Inc. and Terry Harris, regarding the transmittal of funds to investors of WBI.

     1.     It is agreed and understood between the parties that, between March 13, 2003 and July 14, 2003, a series of deposits were made into an escrow account controlled by the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz (formerly known as Berkowitz, Lefkovits, Isom & Kushner and hereinafter referred to as "Baker, Donelson"). These funds were deposited into an interest bearing account controlled by Baker, Donelson with a total deposit of $2,527,776.50. These monies represented investor funds deposited by various investors into a program run and managed by WBI. As of June 25, 2003, the law firm of Baker, Donelson withdrew from its representation of WBI and Terry Harris, but has retained possession of the investor funds, which have been deposited into an interest bearing account, the balance on July 31, 2003 being $2,537,547.96. Baker, Donelson agreed to maintain custody and control of these funds pending joint instructions for disbursement from the Commission, WBI, and Terry Harris.

     2.     Terry Harris and WBI have provided to the Commission what they have represented to be a full and complete listing of all investors into the WBI program and the amount each invested. A true and correct copy of this listing is attached hereto as Exhibit

**Exhibit One, Attachment 6**

"A" and contains the names, addresses, and total investment amount of each investor. Terry Harris and WBI agree that each of these investors is entitled to receive a full refund of their investment in WBI; however, WBI and Terry Harris acknowledge that they do not have the funds available to make full refunds to each investor. The Commission has calculated a pro rata return to each of these investors, based upon the amount represented on Exhibit "A" to have been invested by the investor and the total amount of the funds held by the Baker, Donelson law firm. A true and correct copy of the agreed upon, pro rata refund to each investor is attached hereto as Exhibit "B". In making these calculations, the Commission has relied entirely upon the accuracy of the information contained in Exhibit "A".

3.      Upon execution of this agreement by all parties hereto, it is agreed that Terry Harris, WBI and Networker2000.com, Inc., including any of their officers or agents, waive any claim to the funds held in escrow by Baker, Donelson. Further, it is agreed that these funds will be transferred to the Commission and that the Commission will issue reimbursement checks to each investor, based upon the information contained in Exhibit "A" and Exhibit "B" attached hereto. It is understood and agreed by all parties that these reimbursement checks will not result in a total repayment to the investor but only a partial reimbursement.

4.      It is agreed that the provisions of this Agreement are strictly limited to the funds presently held in escrow by Baker, Donelson and have no impact on any pending or future administrative, civil or criminal matter by the Commission, or any other agency or individual.

2

5.     Nothing herein shall be construed to bind or otherwise prejudice any rights

any investor may have with regard to its relationship with Terry Harris or WBI.

NETWORKER2000.COM, INC.          WEALTH BUILDERS INTERNATIONAL

By: _____          By: _____
Its: _President + CEO_____          Its: _Founder_____


TERRY HARRIS                              ALABAMA SECURITIES COMMISSION

_____                By: _____
                                          Its: _Director_____

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TERRY HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.: 2:05CV1083-WKM-TFM** |
| | ) | |
| **JOSEPH BORG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### AFFIDAVIT OF JOHN M. FOLEY

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| **MONTGOMERY COUNTY** | ) |

John M. Foley, being first duly sworn, deposes and says:

1.    I am John M. Foley, Senior Special Investigator for the Alabama Securities Commission ["ASC"]. In my official capacity, I was involved in the investigation of the securities activities of Terry Harris, Plaintiff in the above-styled action.

2.    Concerning the contention that Joseph Borg, Director of ASC, ordered Mr. Harris to liquidate the stock and option positions of Wealth Builders International held at Charles Schwab, the following applies:

a.    Mr. Harris and his attorneys met with me and other employees of the ASC on numerous occasions after our investigation began.

b.    Andrew R. Chambless of Berkowitz, Lefkovits, Isom & Kushner, P.C., was one of Mr. Harris' attorneys with whom I dealt.

c.    ASC took the position that Mr. Harris was in violation of several of Alabama's securities laws and conveyed that opinion to Mr. Harris and his attorneys, including Mr. Chambless.

d.    Thereafter, Mr. Harris and his attorneys negotiated with the ASC on a manner in which Mr. Harris could close his pooled accounts and return what remained of his investors' contributions to them.

e.    On March 20, 2003 I received a fax from Mr. Harris on his N2K letterhead attached hereto as Attachment 7. That fax begins:

1

**EXHIBIT**

TWO

"I am writing to you in an attempt to shed some light on my attempt to *voluntarily do a quiet rescission of principal and interest earned in the investment club formerly known as Wealth Builders International. I made this decision* only after special agent Reuben Redd stated that we might have a registration problem [emphasis added]." Note: As regards Mr. Harris wholly unjustified claim of racial persecution, Reuben Redd is African American himself.

f.    Also on March 20, 2003, I received a fax from Mr. Harris' attorney, Mr. Chambless, addressing the same issue. It is attached as Attachment 8. In that letter, Mr. Chambless discusses how Mr. Harris "has developed an outline for liquidating the securities positions at Charles Schwab [Attachment 8, paragraph 4]. He states that Mr. Harris "had AmSouth wire transfer all of the funds from the Wealth Builders account… to a trust account" established and controlled by Mr. Chambless' firm [Attachment 8, paragraph 2]. And he says that it is "our intent that … the funds be returned to investors in a manner approved by the Commission [Attachment 8, paragraph 5]."

g.    After receipt of these communications I had several telephone conferences with Mr. Chambless about them. On April 1, 2003, I confirmed my receipt of both of the above documents and the subsequent telephone conferences in a letter to Mr. Chambless [Attachment 9, para 1, line 1-2], beginning my letter of confirmation, "I am writing in response to your March 20, 2003 letter to me and the March 20, 2003 fax to our office from your client, Terry Harris [Id.]." I stated that the ASC believed that the plan outlined in Mr. Harris' fax would cause him to further violate the securities laws by causing him to act as an unlicensed investment advisor and said,

"A better course of action as we have discussed, would be to allow him [Mr. Harris], under your [Mr. Chambless'] supervision and coordination, to liquidate these positions at the most opportune time…[Attachment 9, paragraph 1, lines 4-9].

h.    I had further conversations with Mr. Chambless and memorialized the agreements reached with him as Mr. Harris' attorney in a letter dated April 1, 2003 to Charles Schwab [Attachment 10]. In that letter I stated the ASC had "agreed to a plan whereby *under the supervision and coordination of Mr. Harris' attorney*…the positions held by Wealth Builders International *will be liquidated by Mr. Harris*…[Emphasis added. Attachment 10, paragraph 2 lines 1-5]. Mr. Harris' attorney would provide the notice to liquidate [Id @ paragraph 3 lines 1-2] and the funds would be deposited in an account controlled by Mr. Harris' law firm [Id @ paragraph 2 lines 7-11].

i.    On April 15, 2003 both Mr. Harris and his attorney instructed Schwab to liquidate the accounts [Attachments 3 and 4 to Exhibit One, the Borg Affidavit].

j.    At no time did ASC order liquidation of the accounts. That step was taken by Mr. Harris and his attorneys as set out above. Further, Charles Schwab had elected to

2

close these account months earlier on its own [Attachment 5 to Borg Affidavit]. Thus, Mr. Harris had no choice but to liquidate, irrespective of any actions by Mr. Borg or the ASC.

k.      I am advised that Mr. Harris has made certain allegations that Mr. Borg had racist motivations in pursuing the Harris securities violations. This matter was handled in exactly the same way as matters involving white violators. The primary investigators who handled the Harris investigation, Reuben Redd and Kim Lewis, are African American.

l.      On the matter of the cease and desist order that was ultimately issued by the Commission (months after the liquidation of the funds described above), it was my understanding that Mr. Harris agreed to the issuance of the order. The commission held numerous informal meetings and telephone conferences with Mr. Harris' attorneys and received a copy of the order on which, since it was in an envelope with other materials signed by Mr. Harris, I believe Mr. Harris had written, "Accepted as Truth and I'm Returning This to you for Closure In This Matter.[Attachment 11, see handwriting on the face of page 1]" Until this litigation was instituted many months later, no one ever suggested that Mr. Harris had not sent it or that he did not intend it as "closure" of the cease and desist issue.

m.      Attachment 12 is an Agreement Regarding Wealth Builders International Funds. It was furnished to us with Mr. Harris' signature on three places signifying his agreement. The funds that were received pursuant to this agreement were returned *pro rata* to the investors.

_____

John M. Foley, Senior Special Agent
Alabama securities Commission

Sworn to and subscribed before me on this the 7th day of May, 2007.

(SEAL)

_____
NOTARY PUBLIC
My Commission expires: 3/24/10

3

05/24/2007  16:41    3343534690    ALSECOMM    PAGE  09

MAR-20-03 THU 22:55    P.01

# N2K

Networker2000.com
8315 1st Avenue North
Birmingham, AL 35206
Fax: 1-360-323-2680

| To: | From: | Date 3/20/03 |
|---|---|---|
| Mike Foley | Terry Harris | Number of Pages:    (Including Cover Sheet)<br>Phone: 205-836-5859- Toll Free1-866-330-2330<br>Fax: 1-360-323-2680 FCINETWORK@AOL.COM |

334-242-0240

**Exhibit Two, Attachment 7**



"Turning Dreams Into Reality"

8315-E 1ª Ave N
Birmingham, AL 35206

To: The Alabama Securities Commission
From: Terry Harris, President & CEO/Networker2000.com

I am writing to you in an attempt to shed some light on my attempt to voluntarily do a
quiet rescission of principal and interest earned in the investment club formally known as
Wealth Builders International. I made this decision only after special agent Rueben Redd
stated that we might have a registration problem. I have 8 years of experience in Law
Enforcement and I do not plan to intentionally operate on the other side of the law.
Enclosed you will find a copy of the plan that I submitted to Ms Suzan Anderson to get
approval before I started Wealth Builders International. I understand that you have no
record of this meeting but I would have never started N2K and WBI without first getting
it approved by the Alabama Securities Commission.

First of all I am seeking to return all of the investor's money by transferring it into their
own brokerage account at optionsXpress. Around 1100 of these new optionsXpress
accounts have already been setup in anticipation of the transfer into their account. The
reason the funds have not been transferred yet is because the commission put a block on
the transfer from Schwab to optionsXpress. I'm sure this block was implemented for the
protection of all of the members because the commission didn't know what was being
attempted. I submit to you that the only reason the account was being transferred was for
the purpose of giving the funds back to the members. It was to first be transferred into an
escrow account at optionsXpress and then distributed from there into each member's own
individual account. Immediately all of the cash would have been distributed and then the
options and stock position would have been liquidated as soon as possible and then
distributed later. I estimate that if I am allowed to carefully liquidate these positions so
that it does not take away from the profit that has already been reported to the members,
it should take around 3 months to do so. At that time the rest of the profit would be
returned to the members.

I know that you are investigating me as well as Networker2000. This will not be the
normal type of case that you are use to investigating. The biggest reason is because I am
not motivated to do what I am doing because of money. You will find that my sincere
motivation is to help people learn how to trade options out of their own individual
brokerage account. N2K was built on spiritual principles rather than regular business
principles. The principle that "You can never out give yourself." Therefore it is possible
for me to operate N2K on just 14.3% of the $35.00 that I receive from each web hosting
service customer. The only money that I need is enough to survive off. I now realize that
Van Barringer loaned his other business some money. I did not authorize this but both of
the Barringers have been operating Wealth Builders International without compensation
since it's existence. The plan was for them to invoice N2K and then N2K would pay their
fees and expenses for operating WBI. Since the funds were taken directly out of the
investor's money N2K will be responsible for replacing it to the extent of fees and
expenses owed to the Barringers. The Barringers themselves should replace anything

over that amount. I also understand that because of programming problems we may have
given out too much money in withdrawals to the members. And also because of the
programming problems we may have reported more money than was actually earned in
WBI. After we calculate the right amount in which each member is entitled then N2K
would be responsible for giving him or her the full amount that was previously reported
to him or her. Therefore each member would still receive everything that they believe
they should receive. At that point WBI would no longer exist. N2K would implement an
auto trade program through each member's account at optionsXpress. We instructed each
member to fill out a limited power of attorney form allowing me to trade their account
through the auto trade program at optionsXpress. This was done in error. I now
understand that each member will have to fill out another limited power of attorney form
that allows optionsXpress to do the trading for them. The only thing I will be doing is
sending out a free newsletter to the members as well as posting it on the internet. I will
also send the same newsletter to optionsXpress. Whatever member wants to participate in
the auto trade program will instruct optionsXpress to trade their account based on the
recommendations in my newsletter. I understand that I would not have to be a registered
investment advisor in order to implement this type of auto trade program. At that point I
plan to strengthen the trading lab and set up support groups so that more people will
eventually learn to trade options out of their own brokerage accounts.

The following are a list of advisors that are currently participating in the same auto trade
program at optionsXpress. Most of them are not registered investment advisors but
simply make money off of publishing a newsletter that has stock & options
recommendations.

- Shaeffer's Research
- Big Trend
- Bull Market
- The Contrarian Speculator
- Get Premium
- Investors Observer
- MrSwing
- OptionSmart
- Option Pro
- The Option Strategist
- The Oxford Club
- Profits Run
- Q-Wave
- RightLine
- Sarnoff's Options Hotline
- Success Trading Group
- Taking Care of Business
- Trading Expert
- Trading Tower
- Weiss Research
- X-Wave

05/24/2007  16:41    3343534690          ALSECOMM                        PAGE  07

MAR-20-03 THU 22:57                                                      P.04

The following are the facts demonstrating the integrity and honesty of our program.

- Before I started N2K and WBI I met with Suzan Anderson to get the plan approved. A copy of this original plan is enclosed.
- I was the one that initiated the first contact with special agent Reuben Redd when I discovered that he had questioned some N2K reps. I set up an appointment with him a few days afterwards so that I could give him all of the information that he wanted to know about N2K and WBI.
- I have been fully cooperating with the commission ever since that first appointment with special agent Rueben Redd.
- No one has been harmed by the existence of N2K and WBI. If there were any errors made they were made in favor of the reps by giving them too much money instead shorting them.
- When special agent Rueben Redd stated that WBI might have a registration problem without hesitation I commenced to do a rescission of the member's principle and profit and dissolve WBI.
- As part of the rescission process I instructed all reps to open up their own individual optionsXpress account.
- The process of the rescission was halted when the commission blocked the transfer of money from Schwab to an escrow account that was set up at optionsXpress. Immediately all cash positions was going to be transferred from that escrow account at optionsXpress into each rep's individual optionsXpress account.
- At that point I would have had access, when convenient, to liquidate all of the options and stock positions later and then transfer the rest of the cash over to each individual account.
- The auto trade program at optionsXpress will allow me to publish a free newsletter with recommendations and then deliver it to the reps as well as optionsXpress. The same newsletter will be posted on the internet for free.
- Several publishers of newsletters are currently participating in the auto trade program at optionsXpress without being a registered investment advisor. Some of them have been participating in the auto trade program for 15 years without being a registered investment advisor. I called and talked to Rightline, (rightline.net, 1-512-458-6046), Bigtrends, (bigtrends.com, 1-800-244-8736) and several others.

Terry Harris

President & CEO/Networker2000.com

Objectives of N2K

- To provide Independent Representatives with a life changing program with no start up fees so the average little person can have an opportunity to get out of the rat race and into the chips.
- To provide Independent Representatives with the opportunity to earn the money back that they previously lost in the stock market and programs that turned out to be scams or pyramids schemes.
- To provide Independent Representatives with a program that will supplement incomes from low paying jobs, disability or social security.
- To motivate Independent Representatives into helping others to achieve the same level of success that they enjoy.
- To motivate Independent Representatives into believing they can be a participant on Wall Street through options trading and become a winner on Wall Street.
- To motivate and assist Independent Representatives into opening up their own individual brokerage account, which will eventually allow them to make a higher percentage, return on their money then it would earn in the bank.
- To teach Independent Representatives how to trade options for free so they don't have to worry about spending the going seminar rate of $3,000.00 to $8,000.00.
- To provide Independent Representatives with a powerful marketing plan selling web hosting service, cell phones, local phone service, long distance phone service and ISP Internet service. This will allow them to fund their own brokerage account without it coming out of their pocket.
- To provide trading labs, seminars and support groups in order to support the beginner options trader until they gain more experience.
- To allow Independent Representatives that has not learned to trade options to participate in Networker2000.com's auto trade program.
- To provide the vehicle that makes it possible for Independent Representatives to retire earlier than the age of 65.

If this plan is in compliance then I will need the commission to allow the transfer to take place from Charles Schwab to optionsXpress because the investors have faithfully followed my instructions and have opened up their own brokerage account at optionsXpress and are waiting for the principle and profit that was reported in WBI to be transferred into that account. It is very important that we not liquidate any of the stock or option positions during the transfer because we are holding big stock and option positions that can cause the profit that has been already reported to the members to be lost. Because of the war, the market is very volatile and therefore chances to take profit on the positions that we are currently in will be greater then before. So it is very important that we transfer the account as soon as possible and trade these positions so that it will best benefit the members. I know your interest is for the protection of the investors and I can promise you that my main interest is the same. IBM is the heaviest held position and it went up close to 10 points and I didn't have the opportunity to trade it. The rest of the positions will hurt the investors but not as bad as IBM. I estimate that I can successfully liquidate all of the positions, including IBM, within a 3 months period of time.

05/24/2007  16:41    3343534690            ALSECOMM                    PAGE  04

03-20-03  01:28pm  From-BERKOWITZ ' OVITS ISOM KUSHNER        2052508404        T-433  P.01/03  F-763

# BERKOWITZ, LEFKOVITS, ISOM & KUSHNER

### A Professional Corporation

420 North 20th Street
1600 SouthTrust Tower
Birmingham, AL  35203-5202

Telephone (205) 328-0480 — Telecopier (205) 322-8007

March 20, 2003 - 01:19 PM

3 Page(s)
Including Cover Page

## FACSIMILE COVER SHEET

| | | | |
|---|---|---|---|
| TO: | Mr. Mike Foley | FROM. | Andrew R. Chambless |
| FIRM: | Alabama Securities Commission | PHONE #: | (205) 250-8314 |
| FAX NUMBER: | (334) 242-0240 | CLIENT #: | 38092/1 |
| PHONE #: | | SENT BY: | SML |

## FOR TRANSMISSION PROBLEMS, PLEASE CALL TELECOPY OPERATOR AT (205) 250-8356

**Message:**

CONFIDENTIALITY NOTICE

Unless otherwise indicated or obvious from the nature of the transmittal, this communication is confidential and is intended to be protected from disclosure to persons other than the addressee by the attorney-client privilege, the work-product doctrine, or other applicable law.

If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the U.S. Postal Service. For information regarding our firm, visit our website at www.blik.com

**Exhibit Two, Attachment 8**

05/24/2007  16:41    3343534690                         ALSECOMM                                PAGE   02

03-20-03  01:28pm  From-BERKOWITZ   ·  VITS ISOM KUSHNER          2052508404              T-433  P.02/03  F-763

BERKOWITZ
LEFKOVITS
ISOM &
KUSHNER
A PROFESSIONAL CORPORATION

ANDREW R. CHAMBLESS
ATTORNEY AT LAW
DIRECT DIAL NO  (205) 250-8314
E-MAIL  ACHAMBLESS@BLIK.COM
WEBSITE: WWW.BLIK.COM

March 20, 2003

**VIA FACSIMILE: (334) 242-0240**
**AND FIRST-CLASS MAIL**

Mr. John M. Foley
Senior Investigator
Alabama Securities Commission
770 Washington Avenue, Suite 570
Montgomery, Alabama 36130-4700

Re:    Wealth Builders International

Dear Mike:

We want to bring you up to date with the steps being taken with respect to the proposed Wealth
Builders International ("WBI") rescission.

Last week Mr. Harris had AmSouth Bank wire transfer all of the funds from the Wealth Builders
account at AmSouth to a trust account for the benefit of the Wealth Builders participants
established by us, and under our exclusive control, at Compass Bank.  The amount received in
the trust account was $815,039.98, which is net of AmSouth's $14.00 wire transfer charge.

Yesterday, Mr. Harris caused an additional $50,000 to be wired to the trust account from
NetWorker2000.  This constitutes a return of the $50,000 Networker2000 borrowed from WBI.

Mr. Harris has also informed us that he has developed an outline for liquidating the securities
positions at Charles Schwab.  We would like to coordinate with the Commission and Schwab to
arrange for the wire transfer of the cash presently in the WBI account at Schwab to the trust
account we have established for the WBI participants and also to arrange for the proceeds from
liquidation of the securities positions to be transferred to the trust account as well.

It is our intent that, once the securities positions have been liquidated and the Commission has
completed its analysis of WBI's financial position, the funds be returned to investors in a manner
approved by the Commission.

As we have previously mentioned to you, we do not represent Van Barringer.  We have,
however, spoken to him in connection with our representation of Mr. Harris.  As you know, Mr.
Barringer withdrew money from WBI's AmSouth account after he was instructed not to do so by
Mr. Harris.  Mr. Barringer has informed us that he is willing to discuss the return of these funds,

02-20-03  01:28pm   From-BERKOWITZ  'KOVITS ISOM KUSHNER        2052508404        T-433  P.03/03  F-763

Mr. John M. Foley
March 20, 2003
Page 2

but he is concerned about his expenses under a lease of property at 107 B David Green Road. Apparently, the lease is in Mr. Barringer's name and was formerly used for Mr. Barringer's vitamin business but has been used for WBI business for some time. Along those lines, Mr. Barringer told us that the checks he wrote from WBI to his vitamin business, HealthQuest, were subsequently used by HealthQuest to pay the rent at the 107 B David Green address (*i.e.* to pay rent for property being utilized by WBI). We have asked Mr. Barringer to provide us with documentation to substantiate this. We also asked Mr. Barringer to close the post office box that he has been using to receive funds from WBI participants (P.O. Box 55907 located at the Southside, Birmingham branch of the U.S. Post Office). Mr. Barringer told us that he had already done this and that mail, including checks, were being forwarded to him. We asked that he revoke his forwarding order so that mail going to the post office box would be returned to the sender, and he stated that he would attempt to do so, though he was not certain that the forwarding order could be revoked.

Finally, you may be aware that the United States Securities and Exchange Commission has begun an "informal, nonpublic inquiry" into Wealth Builders International. The SEC has requested that WBI provide voluminous documents and that Mr. Harris appear and testify under oath at the SEC's office in the city of Atlanta, Georgia on Tuesday, April 8, at 10:00 a.m.

Sincerely,

*Andrew R. Chambless*
ANDREW R. CHAMBLESS  by RL

ARC



## ALABAMA SECURITIES COMMISSION

770 WASHINGTON AVE, SUITE 570
MONTGOMERY, ALABAMA 36130-4700
TELEPHONE (334) 242-2984
1-800-222-1253
FAX (334) 242-0240
E-MAIL asc@asc.state.al.us

**CHAIRMAN**
HAROLD B. KUSHNER
Attorney at Law

**VICE CHAIRMAN**
J. WRAY PEARCE
Certified Public Accountant

**COMMISSIONERS**

BILL PRYOR
Attorney General

JOSEPH P. BORG
Director

ANTHONY HUMPHRIES
Superintendent of Banks

SUSAN B. ANDERSON
Deputy Director/General Counsel

WALTER A. BELL
Commissioner of Insurance

TYRONE C. MEANS
Attorney at Law

April 1, 2003

DANIEL C. HARDMAN
Certified Public Accountant

Andrew R. Chambless, Esquire
Berkowitz, Lefkovits, Isom & Kushner
SouthTrust Tower
420, 20th Street, North, suite 1800
Birmingham, Alabama  35203-5202

Re:  Wealth Builders International

Dear Andrew:

I am writing in response to your March 20, 2003 letter to me and the March 20, 2003 fax to our office from your client, Terry Harris. In your letter and in subsequent telephone conversations, we have discussed the most appropriate manner in which to liquidate the securities positions at Charles Schwab. The plan outlined by Mr. Harris in his March 20, 2003 fax is unacceptable. In our view, if Mr. Harris liquidated the securities in the manner that he described, he would still be acting as an unlicensed investment advisor. A better course of action as we have discussed, would be to allow him, under your supervision and coordination, to liquidate these positions at the most opportune time, provided liquidation does not take an inordinate amount of time.

In his March 20, 2003 fax to our office, Mr. Harris attached a letter that he had written to our office directed to former employee Spencer Lee. As you and I have discussed, we have searched our files and have not found a letter referring to Mr. Harris and Wealth Builders International. We have however discovered a file regarding Mr. Harris and his intention to form Infinity Investment Club. In a memorandum to the file dated February 2, 2003, it is documented that on January 26, 2000, Mr. Harris met with Deputy Director Susan Anderson and Registration Analyst, Spencer Lee, pertaining to Mr. Harris's plans concerning Infinity Investment Club. We were of course looking for a file referencing Wealth Builders International, thus the problem in finding Mr. Harris's letter to Mr. Lee. During the aforementioned meeting, Mr. Harris was advised that in

**Exhibit Two, Attachment 9**

Page 2.

order for the club (Infinity Investment Club) to operate as set forth in his letter, it would be necessary to form an investment advisory firm, have all licenses in place (which would include NASD and state exams per representative) and for the club to be the client of that investment advisory firm. Mr. Harris was further advised that if he was the individual who intended to make all the trades for the club, it would be necessary for him to be registered as an Investment Advisor Representative with the Investment Advisory firm. Ms. Anderson emphasized to Mr. Harris that the club was a separate and distinct entity from the investment advisory firm and that it would be necessary for the investment advisory firm to follow "to the letter" all the applicable rules and regulations of the Alabama Securities Act regarding Investment Advisory firms and Investment Advisor Representatives.

Thank your for your cooperation, and I look forward to working with you to resolve this matter.

Sincerely,

John M. Foley
Manager of Investigations

# ALABAMA SECURITIES COMMISSION

770 WASHINGTON AVE, SUITE 570
MONTGOMERY, ALABAMA 36130-4700
TELEPHONE (334) 242-2984
1-800-222-1253
FAX (334) 242-0240
E-MAIL asc@asc.state.al.us

JOSEPH P. BORG
Director

SUSAN B. ANDERSON
Deputy Director/General Counsel

CHAIRMAN
HAROLD B. KUSHNER
Attorney at Law

VICE CHAIRMAN
J. WRAY PEARCE
Certified Public Accountant

COMMISSIONERS

BILL PRYOR
Attorney General

ANTHONY HUMPHRIES
Superintendent of Banks

WALTER A. BELL
Commissioner of Insurance

TYRONE C. MEANS
Attorney at Law

DANIEL C. HARDMAN
Certified Public Accountant

April 1, 2003

Mr. Warren Dreher, Esquire
Charles Schwab & Company, Inc.
101 Montgomery Street
MS101 MONT 23 246
San Francisco CA  94104

Re: Wealth Builders International, Inc.

Dear Mr. Dreher:

As per our telephone discussion of March 27, 2003, the following outlines the Alabama Securities Commission's plan for liquidating the positions held by Wealth Builders International, Inc.

The Commission has agreed to a plan whereby under the supervision and coordination of Mr. Harris' attorney, Andrew Chambless of Berkowitz, Lefkovits, Isom & Kushner, 420, 20th Street North, Suite 1600, Birmingham, Alabama, 35203, telephone 205/ 250-8314, the positions held by Wealth Builders International will be liquidated by Mr. Harris, and the funds resulting from such liquidation will be deposited into account number 8172-3979, designated as the Cash and Sweep Money Market Fund held at Charles Schwab.  Upon completion of the liquidation, Charles Schwab will then be directed to transfer all funds held by Wealth Builders International, and/or any funds connected to the operation of Wealth Builders International, to a Trust Account, #84159719, held at Compass Bank, in Birmingham, Alabama, controlled by the aforementioned law firm representing Mr. Harris. When this is completed, the law firm shall, under the direction of the Alabama Securities Commission, accomplish a prorated return of funds to the involved investors. Wealth Builders International, Inc., will then cease to exist.

Prior to each position being liquidated Schwab will receive a notification letter from Mr. Chambless, approved by the Commission, allowing specific positions to be liquidated.  The same process will be followed for the transfer of all funds to the Compass Bank of Alabama Trust Account.

**Exhibit Two, Attachment 10**

April 1, 2003
Page 2.


    Thank you for your cooperation in this matter.  If you have any questions, please contact me, or the case agent Reuben Redd at the above listed number.


                              Sincerely,


                              John M. Foley
                              Manager of Investigations

# AGREEMENT REGARDING
# WEALTH BUILDERS INTERNATIONAL FUNDS

This agreement made this _30_ day of _September_, 2003, between the Alabama Securities Commission (hereinafter referred to as the "ASC" or the "Commission"), Wealth Builders International (hereafter referred to as "WBI"), Networker2000.com, Inc. and Terry Harris, regarding the transmittal of funds to investors of WBI.

     1.    It is agreed and understood between the parties that, between March 13, 2003 and July 14, 2003, a series of deposits were made into an escrow account controlled by the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz (formerly known as Berkowitz, Lefkovitz, Isom & Kushner and hereinafter referred to as "Baker, Donelson"). These funds were deposited into an interest bearing account controlled by Baker, Donelson with a total deposit of $2,527,776.50. These monies represented investor funds deposited by various investors into a program run and managed by WBI. As of June 25, 2003, the law firm of Baker, Donelson withdrew from its representation of WBI and Terry Harris, but has retained possession of the investor funds, which have been deposited into an interest bearing account, the balance on July 31, 2003 being $2,537,547.96. Baker, Donelson agreed to maintain custody and control of these funds pending joint instructions for disbursement from the Commission, WBI, and Terry Harris.

     2.    Terry Harris and WBI have provided to the Commission what they have represented to be a full and complete listing of all investors into the WBI program and the amount each invested. A true and correct copy of this listing is attached hereto as Exhibit

"A" and contains the names, addresses, and total investment amount of each investor. Terry Harris and WBI agree that each of these investors is entitled to receive a full refund of their investment in WBI; however, WBI and Terry Harris acknowledge that they do not have the funds available to make full refunds to each investor. The Commission has calculated a pro rata return to each of these investors, based upon the amount represented on Exhibit "A" to have been invested by the investor and the total amount of the funds held by the Baker, Donelson law firm. A true and correct copy of the agreed upon, pro rata refund to each investor is attached hereto as Exhibit "B". In making these calculations, the Commission has relied entirely upon the accuracy of the information contained in Exhibit "A".

3.     Upon execution of this agreement by all parties hereto, it is agreed that Terry Harris, WBI and Networker2000.com, Inc., including any of their officers or agents, waive any claim to the funds held in escrow by Baker, Donelson. Further, it is agreed that these funds will be transferred to the Commission and that the Commission will issue reimbursement checks to each investor, based upon the information contained in Exhibit "A" and Exhibit "B" attached hereto. It is understood and agreed by all parties that these reimbursement checks will not result in a total repayment to the investor but only a partial reimbursement.

4.     It is agreed that the provisions of this Agreement are strictly limited to the funds presently held in escrow by Baker, Donelson and have no impact on any pending or future administrative, civil or criminal matter by the Commission, or any other agency or individual.

B SBC 601224 v2
038092-000001 09/30/2003

5.    Nothing herein shall be construed to bind or otherwise prejudice any rights any investor may have with regard to its relationship with Terry Harris or WBI.

NETWORKER2000.COM, INC.                    WEALTH BUILDERS INTERNATIONAL

By: _____                By: _____
Its: _____               Its: _____


TERRY HARRIS                                ALABAMA SECURITIES COMMISSION

_____                     By: _____
                                            Its: _____

B SBC 601224 v2
038092-000001  09/30/2003

STATE OF ALABAMA
ALABAMA SECURITIES COMMISSION

IN THE MATTER OF:



TERRY HARRIS
PATRICIA MONROE TONEY
HULBERT VAN R BARRINGER
SUSAN DIANE BARRINGER
ANTHONY TALLEY JR
NETWORKER2000.COM INC.
Also Known As:
NETWORKER2000
WEALTH BUILDERS
  INTERNATIONAL INVESTMENT
  CLUB
Also Known As:
WEALTH BUILDERS
  INTERNATIONAL INVESTMENT
  CLUB INC
Also Known As:
INFINITY 2000 INVESTMENT
  GROUP AND INVESTMENT CLUB
N2K INVESTMENT CLUB

    RESPONDENTS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ADMINISTRATIVE ORDER
NO. CD-2003-0012

## CEASE AND DESIST ORDER

The Alabama Securities Commission ("Commission"), having the power to administer and provide for the enforcement of all provisions of Title 8, Chapter 6, Code of Alabama 1975, the Alabama Securities Act ("Act"), upon due consideration of the subject matter hereof, and having confirmed information of the offer and sale of securities into, within, or from the State of Alabama, has determined as follows:

**Exhibit Two, Attachment 12**

12